UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

eIQ ENERGY INC., individually
and on behalf of all others similarly situated,

                Plaintiff,

    v.

AVX CORPORATION, ELNA CO.., LTD.,
ELNA AMERICA INC., HITACHI
CHEMICAL COMPANY, LTD., HITACHI
AIC INCORPORATED, HITACHI
CHEMICAL CO. AMERICA, LTD., KEMET
CORPORATION, KEMET ELECTRONICS
CORPORATION, MATSUO ELECTRIC CO.,
LTD., MATSUO ELECTRONICS OF
AMERICA, INC., NEC TOKIN
CORPORATION, NEC TOKIN AMERICA
INC., NICHICON CORPORATION,
NICHICON (AMERICA) CORPORATION,
NIPPON CHEMI-CON CORPORATION,
UNITED CHEMI-CON, INC., PANASONIC
CORPORATION, PANASONIC
CORPORATION OF NORTH AMERICA,
SANYO ELECTRIC CO., LTD., SANYO
ELECTRIC DEVICE (U.S.A.)
CORPORATION, ROHM COMPANY
LIMITED, ROHM SEMICONDUCTOR,
U.S.A., LLC, RUBYCON CORPORATION,
RUBYCON AMERICA INC., TDK
CORPORATION, TDK-EPC
CORPORATION, TDK U.S.A.
CORPORATION, AND VISHAY
INTERCHNOLOGY, INC.

                Defendants.

---

Case No._____

**CLASS ACTION COMPLAINT,
DEMAND FOR TRIAL BY JURY, AND
CERTIFICATION PURSUANT TO
L.CIV. R. 11.2**

JURY TRIAL DEMANDED

---

## CLASS ACTION COMPLAINT

Plaintiff, eIQ Energy, Inc., on behalf of itself and all others similarly situated, brings this

action for treble damages under the antitrust laws of the United States against Defendants.

1

Plaintiff complains and alleges upon information and belief, except as to those paragraphs applicable to the named Plaintiff, which are based on personal knowledge, as follows:

## NATURE OF THE ACTION

1.      This action arises from a conspiracy to fix, raise, maintain or stabilize prices for tantalum capacitors, aluminum electrolytic capacitors and film capacitors (collectively, "Capacitor Products") sold in the United States.  Capacitors are passive electronic components that are used to store electricity and release it when required.  Capacitors are incorporated into almost every electronic device, including audio/video equipment, telecommunication equipment, computers and automobiles.

2.      Plaintiff, on behalf of all persons and entities who purchased Capacitor Products in the United States directly from Defendants, their co-conspirators, predecessors or controlled subsidiaries (the "Class"), brings this action to recover treble damages for violations of the United States antitrust laws.  At all relevant times herein, Defendants and their co-conspirators were involved in the manufacture, distribution and/or sale of Capacitor Products to customers in the United States and throughout the world.  As further alleged herein, during at least the period January 1, 2008 through today (the "Class Period"), Defendants and their co-conspirators agreed, combined and conspired with each other to fix, raise, maintain and/or stabilize the price of Capacitor Products for sale in the United States.  As a result of Defendants' unlawful conduct and conspiracy, Plaintiff and the other members of the Class paid artificially inflated prices for Capacitor Products and have been damaged thereby.

## JURISDICTION AND VENUE

3.      Plaintiff brings this action under Sections 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages and costs of suit, including reasonable attorneys' fees, against

Defendants for the injuries that Plaintiff and the other Class members have suffered from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

4.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 4 of the Clayton Act, 15 U.S.C. § 15(a).

5.      Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22, and 28 U.S.C § 1391(b), (c) and (d).  During the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District.

6.      This Court has personal jurisdiction over each Defendant, because each Defendant – throughout the United States and including in this District – transacted business, sold Capacitor Products, maintained substantial contacts, and/or committed overt acts in furtherance of their illegal scheme and price-fixing conspiracy.  The conspiracy was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.  In addition, Defendant Panasonic Corporation of North America is headquartered in Newark, New Jersey, which is located in this District.

<u>**PARTIES**</u>

<u>**Plaintiff**</u>

7.      Plaintiff eIQ Energy, Inc. ("eIQ") is a California corporation with its principal place of business at 6389 San Ignacio Avenue, San Jose, California.  Plaintiff purchased Capacitor Products directly from one or more of the Defendants or their subsidiaries or affiliates during the Class Period.

**Defendants**

*AVX*

8.      Defendant AVX Corporation ("AVX") is a corporation organized, existing, and doing business under the laws of the State of Delaware, with its headquarters at 1 AVX Boulevard, Fountain Inn, South Carolina 29644.  Kyocera Corporation of Japan, headquartered in Kyoto Japan, owns 72% of outstanding AVX common stock.  AVX maintains a major global position in tantalum capacitors and a minor competitive position in film capacitors.  In 2013, AVX acquired Defendant Nichicon's tantalum capacitor manufacturing facilities in Japan and China.  During the Class Period, AVX, either directly or through its subsidiaries and affiliates, manufactured and/or sold tantalum capacitors and/or film capacitors to purchasers in the United States.

*Elna*

9.      Defendant Elna Co., Ltd. is a Japanese corporation with its head office located at 3-8-11 Shin-Yokohama, Kouhoku-ku, Yokohama, Kanagawa Pref., Japan.  During the Class Period, Elna Co., Ltd. either directly or through its subsidiaries and affiliates, manufactured and/or sold aluminum and/or film capacitors to purchasers in the United States.

10.     Defendant Elna America, Inc., a wholly owned subsidiary of Elna Co., Ltd., is a California corporation with its corporate headquarters located at 970 W. 190th Street, Suite 920, Torrance, California 90502.  Elna America Inc., either directly or through its subsidiaries and affiliates, sold aluminum and/or film capacitors to purchasers in the United States.

11.     Defendants Elna Co., Ltd. and Elna America, Inc. are referred to collectively herein as "Elna."

4

### *Hitachi*

12.     Defendant Hitachi Chemical Company, Ltd. is a Japanese corporation with its head office located at Grantokyo South Tower, 1-9-2, Marunouchi, Chiyoda-ku, Tokyo, 100-6606, Japan. During the Class Period, Hitachi Chemical Company, Ltd., either directly or through its subsidiaries and affiliates, manufactured and/or sold tantalum capacitors, aluminum capacitors and/or film capacitors to purchasers in the United States.

13.     Defendant Hitachi AIC Incorporated, a wholly owned subsidiary of Hitachi Chemical Company, Ltd., is a Japanese corporation with its head office located at 1065, Kugeta, Moka-Shi Tochigi 321-4521, Japan. During the Class Period, Hitachi AIC Incorporated, either directly or through its subsidiaries and affiliates, manufactured and/or sold tantalum capacitors, aluminum capacitors and/or film capacitors to purchasers in the United States.

14.     Defendant Hitachi Chemical Co. America, Ltd., a wholly owned subsidiary of Hitachi Chemical Company, Ltd., is a California corporation with a principal place of business located at 10080 North Wolfe Road, Suite SW3200, Cupertino, California 95014. As of October, 2009, Hitachi Chemical Co. America, Ltd. assumed responsibility for selling Hitachi AIC Inc. capacitors in the U.S.  During the Class Period, Hitachi Chemical Co. America, Ltd., either directly or through its subsidiaries and affiliates, manufactured and/or sold tantalum capacitors, aluminum capacitors and/or film capacitors to purchasers in the United States.

15.     Defendants Hitachi Chemical Company, Ltd., Hitachi AIC Incorporated, and Hitachi Chemical Co. America, Ltd. are referred to collectively herein as "Hitachi."

### *KEMET*

16.     Defendant KEMET Corporation is a corporation organized, existing, and doing business under the laws of the State of Delaware, with its principal executive offices located at

2835 Kemet Way, Simpsonville, South Carolina 29681. During the Class Period, KEMET

Corporation, either directly or through its subsidiaries and affiliates, manufactured and/or sold

tantalum capacitors, aluminum capacitors, and/or film capacitors to purchasers in the United

States.

17.     Defendant KEMET Electronics Corporation is a wholly owned subsidiary of

KEMET Corporation with its principal executive offices located at 2835 Kemet Way,

Simpsonville, South Carolina 29681. In fiscal year 2013, KEMET Electronics Corporation

acquired a 34% economic interest in defendant NEC Tokin Corporation and its tantalum

operations. During the Class Period, KEMET Electronics Corporation, either directly or through

its subsidiaries and/or affiliates, manufactured and/or sold tantalum capacitors, aluminum

capacitors, and/or film capacitors to purchasers in the United States.

18.     Defendants KEMET Corporation and KEMET Electronics Corporation are

referred to collectively herein as "KEMET."

### *Matsuo*

19.     Defendant Matsuo Electric Co., Ltd. is a Japanese corporation with its

headquarters located at 3-5-3 Sennari-cho, Toyonaka-shi, Osaka, 561-8558 Japan. During the

Class Period, Matsuo Electric Co., Ltd., either directly or through its subsidiaries and affiliates,

manufactured and/or sold tantalum capacitors, aluminum capacitors and/or film capacitors to

purchasers in the United States.

20.     Defendant Matsuo Electronics of America, Inc., a wholly owned subsidiary of

Matsuo Electric Co., Ltd., is a California corporation with a principal place of business located at

2134 Main Street, Suite 200, Huntington Beach, CA 92648. During the Class Period, Matsuo

Electronics of America, Inc., either directly or through its subsidiaries and/or affiliates,

manufactured and/or sold tantalum capacitors, aluminum capacitors, and/or film capacitors to purchasers in the United States.

21.    Defendants Matsuo Electric Co., Ltd. and Matsuo Electronics of America, Inc. are referred to collectively herein as "Matsuo."

### NEC Tokin

22.    Defendant NEC Tokin Corporation is a Japanese corporation with its headquarters located at 7-1, Kohriyama 6-chome, Takhaku-ku, Sendai-shi, Miyagi 982-8510, Japan.  On March 12, 2012, KEMET and NEC-Tokin Corporation entered into an agreement whereby KEMET acquired 51% of NEC Tokin Corporation stock.  Under the terms of the alliance, KEMET and NEC-Tokin would cross-sell both companies' products.  During the Class Period, NEC Tokin Corporation, either directly or through its subsidiaries and affiliates, manufactured and/or sold tantalum capacitors to purchasers in the United States.

23.    Defendant NEC-Tokin America Inc., a wholly owned subsidiary of NEC-Tokin Corporation, is a California corporation with a principal place of business located at 2460 North First Street, Suite 220, San Jose, California 95131.  During the Class Period, NEC-Tokin America Inc., either directly or through its subsidiaries and/or affiliates, manufactured and/or sold tantalum capacitors to purchasers in the United States.

24.    Defendants NEC-Tokin Corporation and NEC-Tokin America Inc. are referred to collectively herein as "NEC-Tokin."

### Nichicon

25.    Defendant Nichicon Corporation is a Japanese corporation with its head office located at Karasumadori Oike-agaru, Nakagyo-ku, Kyoto, 604-0845 Japan.  Nichicon designs, manufactures, and supplies capacitors and capacitor-related products on a global scale.  Nichicon

is primarily an aluminum capacitor producer, but it also produces plastic film capacitors. Nichicon also had a significant line of tantalum capacitors, the combination of its own operations and the former Tianjin factory of Matsushita Electric Industrial (Tantalum).  However, in fiscal year 2013, Nichicon sold its tantalum operations to defendant AVX and exited the tantalum market.  During the Class Period, Nichicon Corporation, either directly or through its subsidiaries and affiliates, manufactured and/or sold tantalum capacitors, aluminum capacitors, and/or film capacitors to purchasers in the United States.

26.     Defendant Nichicon (America) Corporation, a wholly owned subsidiary of Nichicon Corporation, is an Illinois corporation with a principal place of business located at 927 East State Parkway, Schaumburg, Illinois 60173.  During the Class Period, Nichicon (America) Corporation, either directly or through its subsidiaries and/or affiliates, manufactured and/or sold tantalum capacitors, aluminum capacitors, and/or film capacitors to purchasers in the United States.

27.      Defendants Nichicon Corporation and Nichicon (America) Corporation are referred to collectively herein as "Nichicon."

### *NCC*

28.     Defendant Nippon Chemi-Con Corporation is a Japanese corporation with its head office located at 5-6-4, Osaki, Shinagawa-ku, Tokyo 141-8605, Japan.  Nippon Chemi-Con Corporation has maintained the number one global market share position for aluminum electrolytic capacitors for more than 20 years.  Nippon Chemi-Con Corporation also sells film capacitors.  During the Class Period, Nippon Chemi-Con Corporation, either directly or through its subsidiaries and affiliates, manufactured and/or sold aluminum capacitors and film capacitors to purchasers in the United States.

29.     Defendant United Chemi-Con, Inc., a wholly owned subsidiary of Nippon Chemi-Con Corporation, is an Illinois corporation with a principal place of business located at 9801 W. Higgins Road, Suite 430, Rosemont, Illinois 60018.  During the Class Period, United Chemi-Con, Inc., either directly or through its subsidiaries and/or affiliates, manufactured and/or sold aluminum capacitors, and/or film capacitors to purchasers in the United States.

30.     Defendants Nippon Chemi-Con Corporation and United Chemi-Con, Inc. are referred to collectively herein as "NCC."

### *Panasonic*

31.     Defendant Panasonic Corporation is a Japanese corporation with its head office located at 1006, Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan.  During the Class Period, Panasonic Corporation, either directly or through its subsidiaries and affiliates, manufactured and/or sold tantalum capacitors, aluminum capacitors and film capacitors to purchasers in the United States.

32.     Defendant Panasonic Corporation of North America, a wholly owned subsidiary of Panasonic Corporation, is a Delaware corporation with its principal place of business located at 2 Riverfront Plaza, Newark, New Jersey 07102.  During the Class Period, Panasonic Corporation of North America, either directly or through its subsidiaries and/or affiliates, manufactured and/or sold tantalum capacitors, aluminum capacitors, and/or film capacitors to purchasers in the United States.

33.     Defendant Sanyo Electric Co., Ltd., a wholly owned subsidiary of Panasonic Corporation, is a Japanese corporation with a head office located at 5-5, Keihan-Hondori 2-Chome, Moriguchi City, Osaka 570-8677, Japan.  During the Class Period, Sanyo Electric Co., Ltd., either directly or through its subsidiaries and/or affiliates, manufactured and/or sold

tantalum capacitors, aluminum capacitors, and/or film capacitors to purchasers in the United States.

34.     Defendant Sanyo Electronic Device (U.S.A.) Corporation, a Delaware corporation, is a wholly owned subsidiary of Sanyo Electric Group, Ltd. and a member of the Panasonic Group, with its principal place of business located at 2055 Sanyo Avenue, San Diego, California 92154.  During the Class Period, Sanyo Electronic Device (U.S.A.) Corporation, either directly or through its subsidiaries and/or affiliates, manufactured and/or sold tantalum capacitors, aluminum capacitors, and/or film capacitors to purchasers in the United States.

35.     Defendants Panasonic Corporation, Panasonic Corporation of North America, Sanyo Electric Co., Ltd., and Sanyo Electronic Device (U.S.A.) Corporation are referred to collectively herein as "Panasonic."

### ***ROHM***

36.     Defendant ROHM Company Limited is a Japanese corporation with its head office located at 21 Saiin Mizosaki-cho, Ukyo-ku, Kyoto 615-8585 Japan.  During the Class Period, ROHM Company Limited, either directly or through its subsidiaries and/or affiliates, manufactured and/or sold tantalum capacitors to purchasers in the United States.

37.     Defendant ROHM Semiconductor, U.S.A., LLC, a Delaware limited liability corporation, is a subsidiary or ROHM Co., Ltd. with its head office located at 2323 Owen Street, Santa Clara, California 95054.  During the Class Period, ROHM Semiconductor, U.S.A., LLC, either directly or through its subsidiaries and/or affiliates, manufactured and/or sold tantalum capacitors to purchasers in the United States.

38.     Defendant ROHM Company Limited and ROHM Semiconductor U.S.A., LLC, are referred to collectively herein as "ROHM."

### *Rubycon*

39.     Defendant Rubycon Corporation is a Japanese corporation with its principal place of business located at 1938-1, Nishi-Minowa, Ina-City, Nagano 399-4593, Japan.  During the Class Period, Rubycon Corporation, either directly or through its subsidiaries and/or affiliates, manufactured and/or sold aluminum capacitors and/or film capacitors to purchasers in the United States.

40.     Defendant Rubycon America Inc., a wholly owned subsidiary of Rubycon Corporation, is an Illinois corporation with its principal place of business located at 4293 Lee Avenue, Gurnee, Illinois 60031.  During the Class Period, Rubycon America Inc., either directly or through its subsidiaries and/or affiliates, manufactured and/or sold aluminum capacitors and/or film capacitors to purchasers in the United States.

41.      Rubycon Corporation and Rubycon America Inc. are referred to collectively herein as "Rubycon."

### *TDK*

42.     Defendant TDK Corporation is a Japanese corporation with its corporate headquarters located at Shibaura Renasite Tower, 3-9-1 Shibaura, Minato-ku, Tokyo, Japan. During the Class Period, TDK Corporation, either directly or through its subsidiaries and/or affiliates, manufactured and/or sold aluminum capacitors and/or film capacitors to purchasers in the United States.

43.     TDK-EPC Corporation, a TDK group company, is a Japanese corporation with its headquarters located at Shibaura Renasite Tower, 3-9-1 Shibaura, Minato-ku, Tokyo, Japan. TDK-EPC Corporation was founded on October 1, 2009 from the combination of the passive components business of TDK and EPCOS AG (In October, 2008, TDK made EPCOS AG a

11

consolidated TDK subsidiary).  TDK-EPC Corporation is responsible for the manufacture of

TDK's electronic components, modules and systems.  During the Class Period, TDK-EPC

Corporation, either directly or through its subsidiaries and/or affiliates, manufactured and/or sold

aluminum capacitors and/or film capacitors to purchasers in the United States.

44.     Defendant TDK U.S.A. Corporation, a wholly owned subsidiary of TDK

Corporation, is a New York corporation with its principal place of business located at 525 RXR

Plaza, Uniondale, NY 11556.  During the Class Period, TDK U.S.A. Corporation, either directly

or through its subsidiaries and/or affiliates, manufactured and/or sold aluminum capacitors

and/or film capacitors to purchasers in the United States.

45.     Defendants TDK Corporation, TDK-EPC Corporation, and TDK U.S.A.

Corporation are referred to collectively herein as "TDK."

### *Vishay*

46.     Defendant Vishay Intertechnology, Inc. is a Delaware corporation with its

principal place of business located at 63 Lancaster Avenue, Malvern, Pennsylvania 19355.

During the Class Period, Vishay, either directly or through its subsidiaries and/or affiliates,

manufactured and/or sold tantalum capacitors, aluminum capacitors and/or film capacitors to

purchasers in the United States.

## AGENTS AND UNNAMED CO-CONSPIRATORS

47.     The acts taken by Defendants, as alleged herein, were authorized, ordered and

condoned by their respective parent companies and authorized, ordered and performed by their

officers, directors, agents, employees or representatives while engaged in the management,

direction, control or transaction of their business affairs.

48.     Various other persons, corporations, or firms not named as Defendants herein have participated in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

## INTERSTATE TRADE AND COMMERCE

49.     Defendants' conduct, as described in this Complaint, was within the flow of, was intended to, and did have a substantial, direct and reasonably foreseeable effect on, the interstate commerce of the United States, including in this District.

50.     During the Class Period, Defendants manufactured, sold and shipped Capacitor Products in a continuous and uninterrupted flow of interstate commerce.

51.     The price-fixing conspiracy in which the Defendants participated had a direct, substantial and reasonably foreseeable effect on interstate commerce.

## CLASS ALLEGATIONS

52.     Plaintiff brings this action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class of plaintiffs (the "Class") consisting of:

> All persons that purchased Capacitor Products in the United States directly from any of the Defendants, their subsidiaries, affiliates or joint-ventures from January, 2008 through the present (the "Class Period"). Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, and governmental entities.

53.     Because such information is in the exclusive control of Defendants and/or their co-conspirators, Plaintiff does not know the exact number of Class members.  Due to the nature of the trade and commerce involved, however, Plaintiff believes that the Class numbers in the hundreds, if not thousands, and that members of the Class are geographically dispersed throughout the United States so that joinder of all Class members is impracticable.

54.     Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and all Class members share the same injury, as they were all damaged by the actions of Defendants, which caused them to pay artificially inflated prices for Capacitor Products.

55.     Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff is a direct purchaser of Capacitor Products and its interests are coincident with and not antagonistic to those of other members of the Class.  Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

56.     This case presents many common questions of law and fact that will predominate over any questions that may affect individual members of the Class, such as:

- Whether the Defendants engaged in a conspiracy to raise, fix, and maintain prices of Capacitor Products sold in the United States;

- The duration and extent of the conspiracy;

- Whether each Defendant was a participant in any such conspiracy;

- Whether the actions of Defendants in so conspiring violated Section 1 of the Sherman Act;

- Whether the conspiracy had the effect of artificially inflating the price of Capacitor Products sold in the United States during the Class Period;

- Whether the conduct of the Defendants caused injury to Class members;

- The measure and amount of damages incurred by the Class; and

- Whether Defendants fraudulently concealed their conspiracy

57.     Adjudicating the claims of the Class members as a class action is superior to the alternative, because it allows for the fair and efficient adjudication of the controversy alleged in this Complaint, while avoiding the risk that the prosecution of separate actions by individual members of the Class would create inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.  Class treatment will also permit the

14

adjudication of relatively small claims by many class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this Complaint. This class action presents no difficulties in management that would preclude maintenance as a class action. Finally, the Class is readily definable and is one for which records of the names and addresses of the Class exist in the files of Defendants.

## FACTUAL ALLEGATIONS

### *CAPACITORS*

58.     Capacitors, sometimes referred to as condensers, are passive electronic components that store, filter and regulate electrical energy and current flow. Capacitors are passive in that they do not add electrical charge to a circuit (like a battery). A capacitor has the ability or "capacity" to store energy in the form of an electrical charge producing a potential difference (static voltage) across its plates, much like a small rechargeable battery.

59.     Principal uses for capacitors include storing electrical charges, conducting alternating current (AC current), and blocking or separating different voltage levels of direct current (DC current) sources. Capacitors are differentiated based on their construction, with different materials providing unique characteristics.

60.     All capacitors have the same basic structure. Two parallel metal electrode plates are separated by a non-conductive "dielectric." When there is a potential difference across the conductors (*e.g.,* when a capacitor is attached to a power source), an electric field develops across the dielectric, causing a positive charge to collect on one plate and a negative charge to collect on the other plate (*see* figure 1).



*(Figure 1).*

61.     Capacitors can store electric charges for long periods of time, and can hold onto a charge even when disconnected from a power source.  Capacitors can charge and discharge fully and instantaneously.

62.     Capacitors are ubiquitous, almost every electronic circuit in the world incorporates capacitors (along with other passive electronic components such as resistors and sometimes inductors).  Products incorporating capacitors include consumer electronics (*e.g.,* TV's, stereos, MP3 players, digital cameras), telecommunications electronics (*e.g.,* cell phones, landlines, office telecom equipment), computers and business machines (*e.g.,* motherboards, monitors, hard disc drives), automotive (*e.g.,* engine control units, ABS cards, entertainment and driver navigation systems), and power and industrial products (*e.g.,* large home appliances, power supplies, power transmission and distribution equipment, solar converters).  Many of these devices contain hundreds of capacitors.  For example, a single Smartphone may have as many as 500 capacitors.

16

63.     The worldwide demand for capacitors is massive.  In 2013, global sales of capacitors exceeded 1.3 trillion units and global revenue for capacitors exceeded $16 billion. Capacitor demand and revenue are projected to increase significantly over the next several years. By 2019, it is estimated that over 2 trillion capacitors will be sold globally for over $22 billion.

64.     Capacitors are typically categorized by their form factor and the dielectric material used in the capacitor.  Based on the dielectric, the four main categories of capacitors are: ceramic; aluminum; tantalum; and film.  Each type of capacitor has a set of characteristics and properties that make them suitable for certain applications, environments, and products.

65.     While there are no meaningful substitutes for capacitors, capacitors are generally considered to be commodity product, meaning that capacitors with similarly rated characteristics (dielectric, capacitance, temperature, voltage, form factor, etc.) can usually be substituted for each other.

66.     Tantalum, the dielectric in tantalum capacitors, is a rare earth mineral and tantalite, the raw material refined to derive tantalum, is considered by the United Nations and named in the Dodd-Frank Act of the U.S. as a "conflict mineral," making the market environment unique and the supply chain subject to rapid price and supply fluctuations.

67.     Although tantalum capacitors have been significantly more expensive than most other types of capacitors, they have traditionally offered high capacitance in a small package, which is particularly useful for compact electronic applications such as smart phones and tablet computers.

68.     Aluminum electrolytic capacitors are constructed from two conducting aluminum foils, one of which is coated with an insulating oxide layer, separated by an electrolytic layer. The foil insulated by the oxide layer is the anode while the liquid electrolyte and the second foil

17

acts as the cathode. This stack is then rolled up, fitted with lead wires and placed in a housing, typically an aluminum cylinder.

69.     The capacitance of an aluminum capacitor is proportionate to the surface area of the aluminum foil plates.  Accordingly, to make capacitors with higher capacitance requires larger plates that are then rolled and placed in larger cylindrical aluminum casings.  Aluminum capacitors usually have a larger form factor than tantalum capacitors and are used in devices that require higher capacitance with fewer space restrictions, such as televisions, video consoles, and desktop computers.

70.     Film capacitors are electrical capacitors with an insulating plastic film as the dielectric, sometimes combined with paper as a carrier of the electrodes. The dielectric films, depending on the desired dielectric strength, are drawn in a special process to an extremely thin thickness, and are then provided with electrodes. The electrodes of film capacitors may be metalized aluminum or zinc applied directly to the surface of the plastic film, or a separate metallic foil overlying the film. Two of these conductive layers are wound into a cylinder shaped winding, usually flattened to reduce mounting space requirements on a printed circuit board, or layered as multiple single-layers stacked together, to form a capacitor body.

71.     Ceramic capacitors are made from two or more alternating layers of ceramic and metal where the ceramic acts as the dielectric and the metal acts as the electrodes.  The most popular type of ceramic capacitor is the multilayer ceramic capacitor ("MLCC") which is constructed with alternating layers.  This stacking allows for increased capacitance and allows for smaller form factors than were previously possible.  Technological advances in manufacturing of MLCC capacitors have allowed manufacturers to increase the number of layers, thereby creating MLCC's with volumetric efficiencies greater than aluminum or film

18

capacitors and, in some instances, competing with tantalum capacitors for small form factor applications.

72.     Ceramic capacitors are significantly less expensive than other capacitors.  For example, in 2013, average pricing per thousand units for ceramic capacitors was $6.57 versus $106.18 for tantalum, $48.53 for film and $38.12 for aluminum.  Recent advances in technology have allowed for less expensive MLCC's to replace more expensive tantalum, aluminum and film capacitors for some applications.

73.     Although MLCC's are increasingly encroaching on tantalum, aluminum and film capacitor applications, manufacturers cannot quickly transition from one type of capacitor to another because circuit boards are designed to incorporate specific types of capacitors with specific technical and operational characteristics.  However, as products are re-engineered, new versions of the products can be designed to incorporate less expensive MLCC's to take the place of more expensive tantalum, aluminum and film capacitors.  This accounts for the fact that between 2003 and 2013, almost all the growth in capacitor unit sales has been for ceramic capacitors (*see* figure 2) and market share for ceramic capacitors has increased from 85% to 90% while tantalum has decreased from 2% to 1%, aluminum has decreased from 10% to 8% and film has decreased from 3% to 1% (*see* figure 3).



*Figure 2*



*Figure 3*

74.     As a result of the increasing and dominant market position of ceramic capacitors, Japanese and American manufacturers of tantalum, aluminum and film capacitors, conspired (as explained below) to fix and stabilize the prices that they charged U.S. purchasers for Capacitor Products.

## THE CAPACITOR MARKET IS CONDUCIVE TO COLLUSION

### 1.     Sales Of Capacitors Are Conducive To Collusion Because They Are Controlled By Only A Limited Number Of Producers.

75.     A highly concentrated market is more susceptible to collusion and other anticompetitive practices.

76.     The capacitor market is concentrated.  Defendants collectively account for a significant percentage of the global capacitor market.

77.     The five largest Defendants collectively control more than 76% of the global market for tantalum capacitors.  KEMET has a 23% share of the global market, AVX has a 21% share, NEC-Tokin has an 11% share, Vishay has an 11% share and Panasonic has a 10% share. Additionally, Defendant Hitachi has a 6% share, Nichicon has a 4% share and Rohm has a 4% share.  Combined, these eight defendants control approximately 90% of the global market.

78.     The five largest Japanese aluminum capacitor manufacturers account for approximately 60% of the global market for aluminum capacitors.  NCC has a 19% share of the global market, Nichicon has a 16% share, Rubycon has a 13% share, Panasonic has an 8% share and Elna has a 3% share.

79.      With respect to capacitor sales to U.S. customers, these market shares are higher. As explained below, U.S. manufacturers tend to make higher priced, value added products and have sought to source more of their aluminum capacitors and other capacitors from Japanese and U.S. capacitor manufacturers.

80.     Defendants collectively also control a significant share of the market for film capacitors.  Panasonic has a 9% share of the global market, KEMET has an 8% share, TDK has a 7% share, Vishay has a 5% share and AVX has a 3% share.  In addition, Defendants NCC, Nichicon, Rubycon, Hitachi, Matsuo and Elna also sell significant quantities of film capacitors worldwide.  These eleven Defendants control well over 50% of the U.S. market for film capacitors and by virtue of the overlap in sales of Capacitor Products and the marketing power derived therefrom, their market power is substantially stronger.

81.     The trend is toward increasing market concentration.  As noted above, KEMET, one of the largest manufacturers, is already in the process of acquiring NEC-Tokin and AVX is in the process of acquiring Nichicon.

2.    **High Barriers To Entry In The Capacitor Market Make The Industry Susceptible To Collusion.**

82.    A collusive arrangement that raises product prices above competitive levels would, under normal circumstances, attract new entrants to the market. Where there are significant barriers to entry, however, new entrants are less likely. With regard to the capacitor market, high barriers to entry have prevented new entrants into the market despite the artificial inflation of prices.

83.    The capacitor industry is mature and is dominated by established corporations with diverse product portfolios, multi-national operations and global reach. These companies have significant experience in the global capacitors industry, and have established reputations with sellers of raw materials and purchasers of finished capacitors.

84.    Entry into the capacitor market involves significant start-up costs. A new entrant would need to finance construction of large scale manufacturing facilities capable of producing the millions of capacitors that would be necessary to compete against the established companies. A new entrant would also need to absorb the costs of acquiring the necessary production technology, including establishing substantial research and development capabilities in order to create and manufacture a broad product portfolio of Capacitor Products, hiring skilled employees and obtaining adequate stockpiles of raw materials. These costs are likely to run into the hundreds of millions of dollars. For that reason, there have been no new entrants during the Class Period. Instead, companies have traded production facilities among themselves.

85.    Moreover some of the necessary raw materials to manufacture capacitors, such as niobium, platinum, palladium, and tantalum are produced in only a limited number of regions around the world or available from only a limited number of suppliers. For example, tantalum is the principal feedstock used to make tantalum capacitors. Conversely, fabrication of tantalum

capacitors accounts for over 60% of tantalum demand in the U.S.  Tantalum is only mined in a few regions in the world, principally South America (Brazil), central Africa (the Democratic Republic of Congo), and Australia.  However, although the Congo is rich in ores containing tantalum, rebels there illegally mine the ore and then sell it to finance their bloody civil war.  As a result, the U.S. passed the Dodd-Frank Wall Street Reform and Consumer Protection Act, Section 1502 of which designates tantalum as a "conflict mineral," and requires that companies using tantalum ensure that their tantalum is not sourced from a conflict region such as the Congo.  These restrictions have resulted in additional supply shortages and price shocks.  Accordingly, potential new tantalum capacitor manufacturers would likely have difficulty securing adequate supplies of tantalum.

86.     The plastic film used to make film capacitors may also be difficult for a new entrant to source.  The dielectric grade resins used to make film capacitors come from a limited number of suppliers in the world, principally DuPont, Teijin, Toray, Mitsui, and Borealis.  These manufacturers make dielectric grade resins in large batches only a few times a year.  Likewise, the converters who apply special conductive coatings to the resin usually only run large batches a few times a year.  For some specialty film coatings, batches are usually run only once a year.  Accordingly, potential new film capacitor manufacturers will also have difficulty securing the necessary adequate raw material inputs.

87.     Even if a new entrant were able to acquire the means to manufacture capacitors (including securing adequate supplies of the necessary raw materials), to compete effectively, the new entrant would also need an established sales network.  The major manufacturers already maintain networks of global distribution centers.  This downstream capability is imperative to competing successfully in the Capacitor Products market.

88.     Finally, the structure of the Capacitor Products market would make it difficult for a new entrant who did not have its own funds to obtain lender financing.  The demand for Capacitor Products has been impacted by the industry-wide move toward the use of ceramic capacitors.  Therefore, a new entrant seeking financing would need to convince lenders to loan it hundreds of millions of dollars to enter a market for low-profit-margin products where profitability depends on achieving large economies of scale despite waning demand.

### 3.     Price Inelasticity For Capacitors Makes The Industry Susceptible To Collusion.

89.     "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other.  For example, demand is said to be "inelastic" if an increase in the price of a product results in no more than a small decline in the quantity sold of that product.  In other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase despite a price increase.  Price inelasticity facilitates collusion, allowing producers to raise their prices collectively without triggering customer substitution and lost sales revenue.

90.     Pricing for capacitors is highly inelastic in large part because there are no adequate substitutes.  As noted above, capacitors are used in virtually every electric circuit and there are no other passive electric components (such as resistors or inducers) that can replicate the function or replace the demand for capacitors.

91.     A hypothetical small but significant increase in the price of capacitors by a cartel would not cause a significant number of purchasers to utilize other materials in lieu of capacitors, nor would such a hypothetical price increase cause so much switching to other products that the increase would be unprofitable.  Capacitors cannot be replaced with other passive components

and capacitors usually represent a small input cost for the high value products in which they are incorporated so that a manufacturer will pay the increased capacitor price so that it can continue to sell its products incorporating the capacitors.

### 4.     Defendants' Capacitor Products Are Interchangeable

92.     While there are no meaningful substitutes for capacitors, capacitors are generally considered to be a commodity product, meaning that Defendants' Capacitor Products with similarly rated characteristics (dielectric, capacitance, temperature, voltage, form factor, etc.) can usually be substituted for each other.

93.     As explained below, the Defendants have been able to differentiate their Capacitor Products from the offerings of other non-U.S. and non-Japanese manufacturers whose products were viewed as inferior.  However, among themselves, the Defendants' Capacitor Products were viewed as fungible.  A purchaser choosing between a Capacitor Product offered by one Defendant versus a similar Capacitor Product offered by another Defendant would choose based primarily on price considerations.

94.     Defendants admit that their Capacitor Products are fungible.  In particular, most Defendants provide cross reference guides to potential customers that specify the Defendant's Capacitor Products either by product number or specifications and then identify interchangeable products manufactured by its competitors.

95.     In addition to the ability to substitute capacitors with identical specifications, there are guidelines allowing for substitution among capacitors with different form factor, dielectric, or specifications so that, for example, a tantalum capacitor can be replaced with an aluminum capacitor provided that certain guidelines are met.  In many cases: increasing to a higher capacitance is acceptable; a component with a tighter (better) tolerance can replace a

capacitor with a lower tolerance; a capacitor with a higher voltage rating may be used in place of or as a substitute for one with a lower rating; a capacitor with a higher (better) temperature rating can replace one with a lower rating; and in many instances, electrostatic capacitors such as film, can be considered as replacements for electrolytic capacitors such as aluminum and tantalum.

96.     There is also significant overlap among the different applications calling for capacitors so that manufacturers can often choose among the competing Capacitor Products when engineering their products.  The below diagram illustrates some of the numerous overlapping applications between ceramic, film and aluminum capacitors.



97.     As described above, the Defendants' Capacitor Products were sufficiently interchangeable so that price was a significant purchasing factor.

5.      **The Defendants Had Many Opportunities To Collude.**

98.      The capacitor industry provides ample opportunities for Defendants to collude and fix the price of capacitors through industry contacts.

99.      Every Defendant is a member of numerous trade associations, including, for example, the Electronic Components Industry Association (the "ECIA") and the Power Sources Manufacturers Association ("PSMA").  Additionally, Defendants regularly attend the yearly Applied Power Electronics Conference and Exposition ("APEC"), which has been held yearly since 1986 and is co-sponsored by other organizations, including the PSMA.

*GOVERNMENT INVESTIGATIONS*

100.      Global coordinated antitrust investigations are taking place in the United States, China, Korea, Japan, Taiwan and Europe regarding price-fixing of capacitors by Japanese manufacturers.

101.      The Antitrust Division of the U.S. Department of Justice (the "DOJ") confirmed that it is conducting an investigation into price fixing of capacitors.  The DOJ investigation is focused on tantalum capacitors, aluminum capacitors, plastic film capacitors, and carbon capacitors.  The DOJ initiated its investigation after a leniency applicant, widely reported to be Panasonic, approached regulators in the United States and China regarding its participation in a worldwide capacitor price-fixing conspiracy.

102.      In 2004, the United States enacted the Antitrust Criminal Penalty Enhancement and Reform Act ("ACPERA").  As an enhancement to the DOJ's leniency program, ACPERA is intended to encourage more companies and individuals to self-report criminal antitrust violations by offering the first company or individual who self-reports a criminal antitrust violation full

immunity from criminal prosecution and limitations from liability in related civil proceedings, provided that the ACPERA applicant provides substantial cooperation in the civil proceedings.

103.    As the ACPERA applicant, Panasonic had to admit to participating in a cartel to fix prices in the Capacitor industry.  Panasonic is fully aware of the criminal and civil costs faced by an antitrust defendant and the benefits of being the ACPERA applicant.  Over the past several years, Panasonic has been the subject of numerous governmental investigations and civil suits regarding antitrust violations.  Panasonic recently pled guilty to DOJ charges that it participated in a widespread conspiracy regarding automotive parts.  In particular, Panasonic agreed to pay a criminal fine of $45.8 million for fixing prices for automotive switches, sensors and HID light ballasts.  Panasonic remains a defendant in the related civil antitrust proceedings.  Panasonic's Sanyo Electric Co. Ltd. subsidiary separately agreed to pay a DOJ criminal fine of $10.73 million for participating in a conspiracy to fix prices for lithium ion batteries.  In or about 2010, Panasonic agreed to pay a $49.1 million DOJ fine for fixing prices for household compressors. Over the past several years, Panasonic has also been named as a defendant by the EU in an investigation into CRT televisions and monitors.  In related U.S. civil litigation regarding price-fixing of CRT televisions and monitors, Panasonic agreed to pay $17.3 million to settle claims brought by direct purchasers.  Panasonic has also been named as a defendant in U.S. civil antitrust litigation regarding price fixing among Optical Disc Drive manufacturers and TFT-LCD flat panel display manufacturers.

104.    The DOJ is not the only competition authority investigating price-fixing among Japanese capacitor manufacturers.  The Policy and Regulatory Report (the "PaRR") issued a special report about an ABA conference held in Beijing May 21-23, 2014.  In the PaRR special report, an article by Lisha Zhou noted that Xu Kunlin, the director general of the Price

Supervision and Antimonopoly Bureau, part of China's National Development and Reform Commission ("NDRC"), confirmed that the NDRC had nearly finished its cartel investigation into the electronic capacitor industry. Xu stated that the NDRC had concluded two rounds of interviews and inquiries into the target companies, all of which are Japanese. Further, Xu confirmed that the NDRC investigation was triggered by a leniency application filed by a Japanese company.

105.    The Korean Fair Trade Commission is also investigating price-fixing of capacitors by Japanese companies, and as part of its investigation, in early May, it inspected the Korean facilities of Defendant Panasonic.

106.    On June 24, 2014, *The Manichi*, one of Japan's three largest newspapers, reported that the Japan Fair Trade Commission (the "JFTC") raided approximately eight Japanese companies suspected of forming a price cartel for capacitors. The companies raided include Defendants Nippon Chemi-Con, Nichicon, Hitachi, NEC Tokin and Panasonic. Nippon Chemi-Con and Panasonic have each confirmed that they are being investigated by the JFTC.

107.    JFTC sources disclosed that the JFTC suspects that the companies under investigation formed a cartel extending overseas from Japan to boost the prices charged for capacitors. According to those sources, sales executives and other officials from the companies discussed and decided on price increases for capacitors and the timing of price hikes.

108.    In addition to the noted investigations by the U.S. DOJ, China's NDRC, the JFTC and the KFTC, the Taiwan Fair Trade Commission and the European Union competition authorities are also investigating capacitor price fixing.

## THE CONSPIRACY

109.    Capacitors are generally considered to be commodity products to the extent that similarly rated capacitors can be substituted for each other.  However, Japanese and U.S. manufactured capacitors have been able to demand a premium over Chinese and Taiwanese capacitors because of their superior quality.

110.    Historically, the two main problems with aluminum capacitors have been the use of a bad sealing (the seal that holds the wrapped foil/electrolyte in the canister) and the use of a bad electrolyte (the dielectric gel that separates the foils).  Bad sealing will allow the electrolyte to leak or evaporate.  A bad electrolyte can vaporize prematurely.  When the electrolyte vaporizes, the capacitor will fail and may even explode.  Once the capacitor fails, the product incorporating the capacitor will stop working or in some instances will self-destruct.  For example, a computer power supply is designed to ensure that constant low voltages are supplied to the components in a computer.  When a power supply capacitor fails, the result may be that voltages with huge fluctuations are passed on to the computer which can burn out motherboards, hard disk drives and other components.

111.    Around October, 2002, mainstream electronics journals began reporting widespread failures of capacitors sourced from Taiwan.  The problem of low cost capacitors failing became known as "capacitor plague" and over the next several years such failures spread throughout the electronics industry.  However, while Chinese and Taiwanese capacitors became infamous for using inferior electrolytes and inferior sealing, leading to premature failure, Japanese and U.S. capacitors earned a reputation for above-average quality (good electrolytes and good sealing) and long product life.

31

112.    The U.S. demand for capacitors is different from demand in Asia to the extent that U.S. manufacturers focus on producing high cost durable products.  Accordingly, U.S. capacitor purchasers are less price sensitive than Asian purchasers because capacitor failures in their products can result in significant repair costs.  For example, by 2005, Dell spent approximately $420 million to fix problems caused by faulty capacitors it had installed in a three year period in over 11 million computers.  Considering that capacitors are a comparatively small cost, U.S. manufacturers have been willing to pay a premium in order to protect their reputations and ensure product longevity.

113.    While Japanese and U.S. manufacturers had enjoyed a price premium over their Chinese counterparts, their ability to charge a premium began to falter in the wake of the 2007 economic downturn.  As a result, the Japanese and U.S. manufacturers sought to take advantage of their market position by agreeing among themselves to raise the prices of their capacitors. The chart below demonstrates the increasing premium Japanese manufacturers were able to charge for their aluminum capacitors as a result of their anticompetitive conspiracy.  U.S. manufacturers were also able to charge similar premiums for their aluminum capacitors.



*Source: U.S. International Trade Commission*

114.    The foregoing chart shows that beginning in approximately January, 2008, following the recession, the price gap between Japanese sourced aluminum capacitors and Chinese sourced capacitors significantly widened.  This gap was the result of the collusion alleged in this Complaint.

115.    A similar price gap occurred with respect to the spread between Japanese sourced tantalum capacitors and capacitors sourced from other foreign manufacturers, as illustrated in the chart below:



*Source: U.S. International Trade Commission*

116.   Because of the correlation in pricing among tantalum capacitors and film capacitors, by no later than 2009, Defendants were also able to impose supra-competitive prices for their film Capacitor Products.

**FRAUDULENT CONCEALMENT**

117.   Plaintiff and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the alleged conspiracy until approximately March 2014, when governmental investigations about the conspiracy were publicly revealed in the press.

34

118.   Defendants engaged in a successful, illegal price-fixing conspiracy that, by its nature, was inherently self-concealing.

119.   Plaintiff and the Class members could not have discovered the alleged contract, combination or conspiracy at an earlier date by the exercise of reasonable diligence, which they did exercise, because of the deceptive practices and techniques secretly employed by Defendants and their co-conspirators to avoid detection of, and to fraudulently conceal, their contract, combination or conspiracy.  While holding themselves out as honest competitors, Defendants fraudulently concealed the contract, combination or conspiracy herein alleged by various means and methods, including, but not limited to, secret meetings and surreptitious communications.

120.   At the same time, Defendants made public statements attributing price increases to market forces, including increased raw material costs and shortages caused by natural disasters, rather than attributing price increases to the effective implementation of their anticompetitive agreement.

121.   The affirmative actions of the Defendants herein alleged were wrongfully concealed and carried out in a manner that precluded detection.

122.   By virtue of the fraudulent concealment by Defendants and their co-conspirators, the running of any statute of limitations has been tolled and suspended with respect to any claims that Plaintiff and the Class members have as a result of the unlawful contract, combination or conspiracy alleged in this Complaint.

## VIOLATIONS ALLEGED

123.   Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

124.     Beginning by no later than January 2008, and continuing through the present, Defendants have engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, or stabilize the prices of Capacitor Products in the United States.

125.     Defendants engaged in anticompetitive activities, the purpose and effect of which were to artificially raise, fix, maintain, or stabilize the price of Capacitor Products sold in the United States.  These activities included:

(a)     participating in meetings, conversations, and communications to discuss the price and pricing terms for the sale of Capacitor Products in the United States;

(b)     agreeing during those meetings, conversations, and communications to charge prices at specified levels and otherwise to fix, raise, maintain, or stabilize prices of Capacitor Products sold in the United States;

(c)     discussing and deciding on price increases for Capacitor Products and the timing of the price increases;

(d)     charging supra-competitive prices in accordance with their agreement for Capacitor Products sold in the United States; and

(e)     taking numerous steps, as set forth above, to implement and maintain their conspiracy.

126.     Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in this Complaint.

127.     Throughout the Class Period, Plaintiff and the other Class members purchased Capacitor Products from Defendants (or their subsidiaries or controlled affiliates) at supra-competitive prices.

128.   Defendants' contract, combination or conspiracy constitutes an unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## ANTI-COMPETITIVE EFFECTS

129.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and the other Class members have been injured in their business and property because they have paid more for Capacitor Products than they would have paid in the absence of the illegal conspiracy.

130.   Defendants' unlawful contract, combination, or conspiracy has had at least the following effects:

    (a)   price competition in the markets for Capacitor Products has been artificially restrained;

    (b)   prices for Capacitor Products sold by Defendants have been raised, fixed, maintained, or stabilized at supra-competitive levels; and

    (c)   purchasers of Capacitor Products from Defendants have been deprived of the benefit of free and open competition in the markets for Capacitor Products.

131.   The foregoing allegations are likely to have evidentiary support after a reasonable opportunity for discovery.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

    a.   Declaring this action to be a proper class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein;

b. That the contract, combination, or conspiracy, and the acts done in furtherance thereof by Defendants be adjudged to have violated Section 1 of the Sherman Act, 15 U.S.C. § 1.

c. That judgment be entered for Plaintiff and Class members against Defendants for three times the amount of damages sustained by Plaintiff and the Class, as allowed by law.

d. That Plaintiff and the Class recover pre-judgment and post-judgment interest, as permitted by law.

e. That Plaintiff and the Class recover their costs of the suit, including attorneys' fees, as provided by law.

f. For such other and further relief as is just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

Dated:  August 1, 2014

Dennis J. Drasco
Arthur M. Owens
**LUM, DRASCO & POSITAN, LLC**
103 Eisenhower Parkway
Roseland, NJ 07068
Phone: 973-403-9000
Fax: 973-403-9021
DDrasco@lumlaw.com
AOwens@lumlaw.com

Howard J. Sedran, *pro hac vice pending*
Austin B. Cohen, *pro hac vice pending*
Keith J. Verrier, *pro hac vice pending*
**LEVIN, FISHBEIN, SEDRAN & BERMAN**
510 Walnut Street, Suite 500
Philadelphia, PA  19106
Tel: 215-592-1500
Fax: 215-592-4663
hsedran@lfsblaw.com
acohen@lfsblaw.com
kverrier@lfsblaw.com


Roberta D. Liebenberg, *pro hac vice pending*
Donald L. Perelman, *pro hac vice pending*
Gerard A. Dever, *pro hac vice pending*
Paul Costa, *pro hac vice pending*
Ria Momblanco, *pro hac vice pending*
**FINE, KAPLAN AND BLACK, R.P.C.**
One South Broad Street, 23rd Floor
Philadelphia, PA 19107
Phone: (215) 567-6565
rliebenberg@finekaplan.com
dperelman@finekaplan.com
gdever@finekaplan.com
pcosta@finekaplan.com
rmomblanco@finekaplan.com


W. Daniel "Dee" Miles, III, *pro hac vice pending*
**BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, P.C.**
218 Commerce Street
Post Office Box 4160 (36103)
Montgomery, AL 36104
Tel: 334.269.2343
Fax: 334.954.7555
Dee.Miles@BeasleyAllen.com

*Attorneys for Plaintiff eIQ Energy, Inc.*

## LOCAL RULE 11.2 CERTIFICATION

The undersigned certifies and declares that the matter in controversy is not the subject of any other action pending in any other court, or of any pending arbitration or administrative proceeding.

LUM, DRASCO & POSITAN LLC
*Attorneys for Plaintiff, eIQ Energy, Inc.*

By: _____
Dennis J. Drasco

DATED: August 1, 2014